**TA LEGAL GROUP PLLC**
Taimur Alamgir, Esq.
315 Main Street, Second Floor
Huntington, NY 11743
(914) 552-2669
tim@talegalgroup.com
*Co-Counsel For Plaintiff Anna E. Molosky*

**BROWN KWON & LAM LLP**
William M. Brown, Esq.
521 Fifth Avenue, 17th Floor
New York, NY 10175
(718) 971-0326
wbrown@bkllawyers.com
*Co-Counsel For Plaintiff Anna E. Molosky*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X

 ANNA E. MOLOSKY

               Plaintiff,                      **Case No.**

                    - against –           **COMPLAINT**

AMAZON WEB SERVICES, INC.,        **Jury Trial Demanded**
AMAZON.COM, INC., and AMAZON
DEVELOPMENT CENTER U.S., INC.,

               Defendants.

-------------------------------------------------------------X

      Plaintiff, Anna E. Molosky ("Plaintiff" or "Ms. Molosky"), through her undersigned co-counsel of record, hereby files this Complaint against Defendants, Amazon Web Services, Inc., Amazon.com, Inc., and Amazon Development Center U.S., Inc. (collectively, "Amazon", "AWS", or "Defendants"), and alleges as follows:

1

## I.     INTRODUCTION

1.     Ms. Molosky is a female executive who assumed that, in this day and age, her employer would judge her based on her performance and abilities. She did not think that Amazon would treat her differently because she is a woman. But, as Ms. Molosky came to discover, the glass ceiling is alive and well at AWS. Ms. Molosky's efforts to "**lean in**"[1] and pursue advancement at AWS were met with overt sex and gender discrimination, unequal pay and retaliation, culminating in Ms. Molosky's illegal termination.

2.     The record reflects that Ms. Molosky's supervisors at AWS—**all of whom were men**—openly refused to assess her performance on the merits thereof, instead relying on sexist beliefs and stereotypes. Male colleagues were deemed more valuable and received higher compensation, despite being less experienced and proficient at their work. Male colleagues with lesser technical qualifications than Ms. Molosky were chosen to supplant Ms. Molosky on projects that she previously led with distinction, because her supervisors operated under the antiquated and false premise that, as a woman, Ms. Molosky was incapable of understanding complex technical issues. Male colleagues were praised for showing initiative, whereas Ms. Molosky was derided by her male supervisors for not being a team player, and routinely faced subjective and questionable criticism claiming perceived deficits in communication skills and "earning trust."

3.     Most of all, Ms. Molosky's male supervisors were openly disdainful of her efforts to advance within AWS. Multiple supervisors not only resisted Ms. Molosky's efforts to "lean in", but expressly demanded that Ms. Molosky "**lean back**" away from leadership and technical roles that they evidently viewed as reserved for men.

---

[1] *See* Sandberg, Sheryl (2013). *Lean In: Women, Work, And The Will To Lead*.

4.      When Ms. Molosky complained about AWS's discriminatory practices, AWS immediately concocted a pretext for her termination. Citing trumped-up "performance issues", AWS subjected Ms. Molosky to performance improvement objectives based on subjective and shifting criteria designed to generate a pretext for her illegal firing. The use of this sham process preordained to result in the termination of Ms. Molosky is proof that the termination decision was illegal and illegitimate.

5.      As discussed herein, Ms. Molosky requests that the Court hold Amazon accountable for its unlawful and discriminatory actions.

## II.    CLAIMS

6.      Pursuant to Title VII of the Civil Rights Act of 1964, Ms. Molosky seeks to hold Defendants liable for subjecting her to sex and gender discrimination. In connection with her Title VII claims, Ms. Molosky seeks declaratory, injunctive, and equitable relief, and monetary damages, including economic damages, compensatory damages, punitive damages, and attorneys' fees and costs.

7.      Pursuant to New York State Human Rights Law and New York City Human Rights Law, New York State Executive Law, Article 15 §§ 290 et seq. ("NYSHRL") Ms. Molosky looks to hold Defendants liable for unlawful sex and gender discrimination, retaliation, and a hostile work environment in response to protected complaints and opposition activity during employment and seeks damages including declaratory, injunctive and equitable relief, and monetary damages including economic damages, compensatory damages, punitive damages, and attorneys' fees and costs.

8.      Pursuant to the New York City Human Rights Law ("NYCHRL"), Ms. Molosky seeks to hold Defendants liable for subjecting her to sex and gender discrimination, retaliation,

and a hostile work environment in response to protected complaints and opposition activity during employment. In connection with her NYCHRL claims, Ms. Molosky seeks declaratory, injunctive, and equitable relief, and monetary damages, including economic damages, compensatory damages, punitive damages, and attorneys' fees and costs.

9.       Pursuant to the Equal Pay Act of 1963, 29 U.S.C § 206 (d), Ms. Molosky seeks to hold Defendants liable for disparity in pay based on her sex and gender and seeks damages including declaratory, injunctive and equitable relief, and monetary damages including economic damages, compensatory damages, punitive damages, and attorneys' fees and costs.

10.      Pursuant to the New York Equal Pay Law, NYLL § 194, Ms. Molosky seeks to hold Defendants liable for disparity in pay based on her sex and gender and seeks damages including declaratory, injunctive and equitable relief, and monetary damages including economic damages, compensatory damages, punitive damages, and attorneys' fees and costs.

11.      Pursuant to New York Labor Law § 215, Ms. Molosky seeks to hold Defendants liable for disparity in pay based on her sex and gender and seeks damages including declaratory, injunctive and equitable relief, and monetary damages including economic damages, compensatory damages, punitive damages, and attorneys' fees and costs.

## III.    JURISDICTION, VENUE, AND ADMINISTRATIVE PRE-REQUISITES

12.       This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1337.

13.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

14.     This Court alternatively has diversity jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332, as Plaintiff and Defendants are citizens of different states and the amount in controversy is in excess of $75,000.

15.     This Court has personal jurisdiction over Defendants pursuant to CPLR § 302 because Defendants each transact a significant volume of business in the State of New York and contracts to supply goods and services within the State of New York.

16.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

17.     Defendants engage in an enterprise whose annual volume of sales made or business done is not less than $500,000 and the activities of which affect interstate commerce, in that the employees of Defendants (including Plaintiff) handle goods and materials produced outside of New York that have moved in interstate commerce. Defendants are therefore subject to the jurisdiction of the Equal Pay Act.

18.     Title VII jurisdictional pre-requisites have been satisfied as to all Defendants. Plaintiff's counsel and Plaintiff received notice of issuance of right to sue with respect to each of Defendants on November 4, 2024, and filed this Complaint within 90 days thereof. *See* Exhibit A, Notices.

## IV.    THE PARTIES

### A.  <u>Defendants</u>

19.     Defendant Amazon Web Services, Inc. is the world's leading provider of cloud computing services. Amazon Web Services, Inc. is a foreign business corporation incorporated

under the laws of the State of Delaware, with a corporate headquarters in the State of Washington and corporate offices located in New York, NY.

20.    Defendant Amazon.com, Inc. is a foreign business corporation incorporated under the laws of the State of Delaware, with a corporate headquarters in the State of Washington and corporate offices located in New York, NY. Amazon.com, Inc. is the parent company of Amazon Web Services, Inc. and Amazon Development Center U.S., Inc.

21.    Defendant Amazon Development Center U.S., Inc. is a foreign business corporation incorporated under the laws of the State of Washington with a corporate headquarters located in Washington.

22.    Each of the Defendants individually meets the definition of an "employer" under Title VII, with respect to Ms. Molosky.

23.    Collectively, Defendants comprise a "single employer"[2] for purposes of Title VII. Defendants have interrelated operations, centralized human resources and control of labor relations, common senior management, and common ownership and financial control. Amazon.com, Inc. holds overall managerial control and operational oversight, and provides human resources services for all of AWS, including with respect to Ms. Molosky and her employment.

24.    Notably, Amazon.com, Inc. has a fraught history of sex discrimination against women in its workforce, and systematically underpaying female employees relative to male

---

[2] "[A]n employee, who is technically employed on the books of one entity, which is deemed to be part of a larger 'single-employer' entity, may impose liability for certain violations of employment law not only on the nominal employer but also on another entity comprising part of the single integrated employer.". *Arculeo v. On-Site Sales & Marketing, LLC*, 425 F.3d 193, 198 (2d Cir. 2005). When considering whether two entities are a single employer, courts consider four factors "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Cook v. Arrowsmith Shelburne*, Inc., 69 F.3d 1235, 1240 (2d Cir. 1995)

employees. In this regard, Amazon.com, Inc. is presently facing a class action lawsuit[3] alleging discriminatory pay practices on behalf of thousands of female employees around the country.

25.    Ms. Molosky's case is a particularly egregious example of Amazon's persistently discriminatory treatment of female employees.

26.    The EEOC Charge was timely filed, as was this Complaint.

The record reflects that AWS upholds an antiquated view of the workplace and the role of women therein, and a cavalier disregard for female employees like Ms. Molosky who seek to be judged on their merits rather than on the basis of gender stereotypes and sexist considerations.

**B. <u>Plaintiff</u>**

27.    Ms. Molosky is a skilled and accomplished executive with over fifteen years of experience in technical product management and strategy and a track record of outstanding performance in senior-level roles at premier global companies.

28.    Ms. Molosky holds a Bachelor of Science in Information Systems from Carnegie Mellon University and a Graduate Certificate in Artificial Intelligence (AI) Product Innovation from Duke University. Ms. Molosky is Certified as an AWS Solutions Architect, an AWS AI Practitioner, an AWS Cloud Practitioner, and an AWS Business Partner, among otherCertifications. These AWS-specific qualifications reflect Ms. Molosky's technical acumen.

29.    Ms. Molosky was employed at AWS from 2021 until her illegal termination on December 4, 2023.

---

[3] *Wilmuth, et al. v. Amazon.com, Inc.*, Case No. 2:23-CV-1774, U.S. District Court, Western District of Washington.

30.     Shortly prior to joining AWS, Ms. Molosky was a Principal at Two Sigma Investments, LP, a multibillion-dollar quantitative hedge fund and one of the top ten largest hedge funds, as measured by Assets Under Management or AUM, in the world. At Two Sigma, Ms. Molosky developed a dynamic monetization strategy to convert free users of the Company's software into paying customers and launched a product innovation program that achieved $7.2 million in annualized recurring revenue, with 95% paid customer retention in the first year after launch.

31.     Earlier in her professional career, Ms. Molosky was employed at Goldman Sachs & Co. as Vice President of Product Management, Strategy, and Design. At Goldman, Ms. Molosky led product development for the Company's international Award-Winning Marquee Investment Platform. Ms. Molosky also founded and monetized Goldman's Data Analytics business, which earned $4.5 million in revenue in its first year and earned $75 million in its third year.

32.     Ms. Molosky is a globally recognized writer and thought leader. In 2023 and 2024, she was recognized by LinkedIn as a Top Voice in Product Strategy, a Top Voice in Product Management, and a Top Voice in Artificial Intelligence (AI).

33.     Ms. Molosky has also been recognized as a top public speaker by Women Impact Tech, a professional network that advances gender equity in technology so that women can thrive in their careers and organizations can build productive, diverse, and inclusive teams.

## V.     MS. MOLOSKY'S EMPLOYMENT WITH AWS

34.     Ms. Molosky was originally hired in 2021 by AWS as a Senior User Experience ("UX") Designer in Defendants' New York, NY office location.

35.     However, on or about May 2, 2022, AWS internally transferred Ms. Molosky to a "Senior Product Manager – Tech" ("Senior PMT") position.

36.     AWS approved Ms. Molosky's internal transfer because it recognized, shortly after Ms. Molosky joined AWS, that Ms. Molosky possessed the necessary background, skill set, financial domain expertise, and work ethic to excel in a management role. In this regard, Ms. Molosky's strong performance and insight was recognized by senior-level management, including AWS Vice President Gleb Shaviner, who was vocal about being impressed by Ms. Molosky and went out of his way to seek out her counsel beginning in October 2021 (about one month after Ms. Molosky began her employment at AWS), even prior to her transfer to his group. Ms. Molosky also demonstrated her aptitude for management at AWS by taking on the responsibilities of two male Senior PMTs in January 2022, after both men left the Team and four months before AWS officially recognized Ms. Molosky's work by approving her internal transfer.

37.     Ms. Molosky was an exceptionally strong performer in the strategic and technical product management roles she assumed at AWS. Amongst many other highlights, Ms. Molosky spearheaded two initiatives at AWS that resulted in a significant expansion of revenue.

38.     At AWS, Ms. Molosky led the Unbilled Usage Initiative, a project with the objective of reforming and optimizing AWS's pricing methodologies. Under Ms. Molosky's leadership, the Unbilled Usage Initiative generated an impressive $580 million in additional annual recurring revenue, which, based upon the substantial foundation Ms. Molosky built, continues to grow today—to approximately $640 million in additional annual recurring revenue—despite Ms. Molosky's illegal termination in December 2023.

39.     Ms. Molosky also founded and led the ProdStrat Initiative (shorthand for the "Product Strategy Initiative") at AWS, which developed—amongst other crucial functionality—a pricing rules engine to automate pricing and, as one example of the success thereof, empowered AWS to fulfill its most lucrative foreign and domestic government and enterprise contracts twenty

times faster, thereby unlocking more than $55 billion in revenue (over 10 years) for AWS while ensuring full compliance with government pricing regulations and enterprise contractual obligations. Ms. Molosky's multi-year ProdStrat Initiative involved the development of a comprehensive end-to-end digital Platform to enable new pricing models, automated pricing, configuration, billing, invoicing, and marketing of AWS's cloud service products for AWS's cloud service product teams. Ms. Molosky not only created, but also named and branded this initiative as "ProdStrat." Due to Ms. Molosky's efforts, the ProdStrat Initiative received widespread acclaim from top AWS executives, including, but not limited to James Greenfield, Senior Vice President and Head of AWS's Global Commerce Platform. AWS fully funded the Initiative with Ms. Molosky as the Lead by January 2023 and planned to implement ProdStrat across the entire Company.

40.     Ms. Molosky's successful leadership of these complex technical initiatives was attributable to her subject-matter expertise, deep technical acumen, and to her past experiences working in the financial sector at Two Sigma and Goldman Sachs, where she acquired significant financial technology ("FinTech") experience and a FINRA (Financial Industry Regulatory Authority) General Securities Representative License (passing the required Series 7 and Series 63 examinations).

41.     Ms. Molosky's supervisors and other senior-level AWS officials routinely recognized Ms. Molosky's superior performance:

    a.   Ms. Molosky's manager from May 2022 until May 2023, AWS Director, Christof Hellmis ("Hellmis"), praised Ms. Molosky effusively: "*Anna's super power is to do heads down work related to understanding customer needs, and translating the insights into requirements and CX improvements*."

b. AWS Senior Engineering Manager, Manish Verma, stated, "*Anna has a natural talent for democratizing complex subjects, when either, sharing her team's accomplishments to upper management or with the organisation . . .*"

c. AWS Vice President Gleb Shaviner stated, "*Anna leads by example by building an inspiring vision… She helps teams better understand their customers earning trust of her peers.*"

42. Ms. Molosky's slew of accomplishments and recognition at AWS is particularly remarkable given the escalating discrimination, retaliation, and hostile work environment she endured during her employment at AWS.

43. As discussed below, AWS's refusal to even *acknowledge* Ms. Molosky's unquestionable productivity and contributions to business growth during the bias-tainted and preordained process leading up to Ms. Molosky's illegal termination is proof of pretext.

## VI. AMAZON UNDERCOMPENSATED MS. MOLOSKY RELATIVE TO MALE COMPARATORS

44. Throughout her tenure as a Senior PMT, AWS grossly undercompensated Ms. Molosky in relation to male colleagues in comparable roles due to discriminatory animus.

45. AWS discriminated against Ms. Molosky upon the internal transfer to the Senior PMT role by misclassifying her as a "Level 6 PMT", even though her work, responsibilities, and accomplishments were clearly beyond those of a Level 6 PMT and consistent with a higher "Level 7 PMT" classification, per Amazon's PMT – Product Manager Technical Role Guideline Document. After all, as noted above, Ms. Molosky was already performing the work of two Level 6 PMTs who had left the team in January 2022. AWS "under-leveled" Ms. Molosky—i.e., placed her in the lower Level 6 PMT classification even though her duties and responsibilities met the Level 7 PMT classification—as a result of unlawful sex and gender-based animus.

46.     Ms. Molosky's annual compensation in 2023 was $293,343 (inclusive of cash bonus compensation and vested stock).

47.     Due to sex and gender discrimination, Ms. Molosky's annual compensation fell well below the average annual compensation earned by Level 6 PMTs in comparable roles to Ms. Molosky ($349,300).

48.     Moreover, Ms. Molosky's total compensation (including salary and bonus) fell below that of male PMTs in the Level 6 classification. Substantially less experienced male PMTs were paid as much or more than Ms. Molosky.

49.     The Amazon PMT – Product Manager Technical Role Guideline Document lists the responsibilities and attributes of a Level 7 PMT, which Ms. Molosky consistently fulfilled. According to these Guidelines, a Level 7 PMT "[w]orks on large, important product initiatives" and "[d]efines the long-term strategy and vision to meet emerging customer needs and technologies." A Level 7 PMT also "[h]andles significantly complex product development and management scenarios."

50.     Ms. Molosky's leadership of the Unbilled Usage Initiative and ProdStrat Initiative plainly qualified her for the Level 7 PMT position.

51.     Ms. Molosky was explicitly told that her work was at the level of a Level 7 PMT. On July 11, 2022, while at a strategic leadership team offsite in Berlin, AWS Vice President Gleb Shaviner praised Ms. Molosky, stating "You're doing the work of three Level 7s."

52.     Nevertheless, Ms. Molosky's compensation was *below one-half* of what Level 7 PMTs earn on average ($600,300) at AWS.

53.     As discussed below, Ms. Molosky repeatedly complained about and displayed opposition to the lack of pay equity at AWS.

VII.    **AMAZON    SUBJECTED    MS.    MOLOSKY    TO    EMPLOYMENT    DISCRIMINATION**

A.    <u>**Discriminatory Treatment of Ms. Molosky Between January 2022 and May 2023**</u>

54.    Upon "officially" transitioning to the Senior PMT position in May 2022, Ms. Molosky was the only female PMT in her group.

55.    At all relevant times, the group leader was Mr. Hellmis, who directly supervised Ms. Molosky from May 2022 until May 2023.

56.    The backward approach to women in the workplace prevalent at AWS, and espoused by Mr. Hellmis' group leadership in particular, emerged to Ms. Molosky during a bizarre "New Leader Assimilation" workshop in Berlin on July 14, 2022, shortly after Ms. Molosky officially joined the group.

57.    The topic of the "New Leader Assimilation" workshop was Mr. Hellmis. At the time, Ms. Molosky had limited personal interactions with Mr. Hellmis, who is based in the Berlin AWS office. The conversation, facilitated and witnessed by Daniel Rau, then a Senior Member of the Amazon HR Leadership team in Europe—and, since October 2023, the HR Lead for Software Development across Europe, the Middle East and Africa (EMEA)—was, according to Mr. Rau, *supposed to be* anonymous.

58.    The conversation swiftly turned to harsh criticism of Mr. Hellmis' attitudes towards female leadership. A male attendee, David Cooper (Senior PMT Level 6), pointed out that "there are no female leaders here [under Hellmis]." Another male attendee, Jason Harris (Principal Engineer Level 7), mentioned the strong "bro culture" within the team, which was attributable to Mr. Hellmis. These observations were recorded on a whiteboard by Mr. Rau.

59.     This conversation ended abruptly because, despite the promise of anonymity provided by the Amazon HR Leader to the group, Mr. Hellmis entered the room and viewed the whiteboard discussing his failure to elevate female leaders and promotion of a strong "bro culture".

60.     Ms. Molosky was taken aback and deeply concerned by Mr. Hellmis' misogynistic reputation and by his sudden physical appearance in the closed-door meeting, which appeared timed to short-circuit criticism of Mr. Hellmis' views on women in the workplace.

61.     On or about January 25, 2023, Mr. Hellmis admonished Ms. Molosky based on his subjective perceptions of her "communication skills" as lacking, and her alleged failure to "win [the] trust" of her team. Mr. Hellmis directed Ms. Molosky to reduce her "visibility" to and advocacy for the objectives of AWS's executive leadership and instead work on a "roadmap" to rectify the subjective issues that he raised. Notably, Mr. Hellmis never indicated to Ms. Molosky that this was a formal disciplinary action.

62.     Mr. Hellmis' criticisms and demands that Ms. Molosky be less "visible" were based on his discriminatory belief that, as a woman, Ms. Molosky should know her place.

63.     On February 17, 2023, Mr. Hellmis informed Ms. Molosky that she had rectified the issues he raised on January 25, 2023, to his satisfaction. Mr. Hellmis subsequently confirmed to Ms. Molosky in a March 23, 2023 videoconference call that she had completed the roadmap and rectified all of the subjective issues he had previously raised.

64.     During an April 14, 2023 "Forte" meeting (Amazon's internal term for the yearly formal meeting regarding an employee's performance evaluation and future compensation), Mr. Hellmis actively discouraged Ms. Molosky from pursuing internal advancement at AWS.

65.     During the Forte meeting, Mr. Hellmis made a series of baseless attacks on Ms. Molosky's technical skills relative to her male colleagues, conveniently disregarding Ms.

Molosky's AWS technical Certifications and other qualifications (which are superior to any of her male PMT colleagues, including those at Level 7). These attacks were predicated on Mr. Hellmis' perception of women as inferior and his reliance on offensive stereotypes.

66.    Mr. Hellmis further questioned Ms. Molosky's ambitions to advance at AWS during the Forte meeting, explicitly urging her to "**lean back**" instead of pursuing promotion and higher pay.

67.    Ms. Molosky made a protected complaint regarding pay equity during the Forte meeting. Ms. Molosky asked whether total compensation for a PMT was dependent on "performance" or something else and complained that her compensation was reduced (to levels below that of male colleagues). Mr. Hellmis responded vaguely, stating that AWS's practices for determining compensation were a "well-kept secret," and downplayed the importance of pay equity.

68.    In early May 2022, Ms. Molosky made a complaint to Andrea Devers, an HR official (Level 6), regarding pay equity. Ms. Devers refused to take action, stating that she was not responsible for addressing issues raised by Level 6 PMTs, and referred Ms. Molosky to a Level 4 HR Official, who never responded to Ms. Molosky via email or in any other fashion.

**B.    Discriminatory Treatment of Ms. Molosky Between May 2023 and September 2023**

69.    Another male AWS manager, Puneet Jindal ("Jindal") was appointed to serve as Ms. Molosky's direct manager under Mr. Hellmis, starting in late May 2023.

70.    Before formally taking over as Ms. Molosky's direct supervisor, Mr. Jindal held a 1-on-1 introductory meeting with Ms. Molosky on April 20, 2023. During that meeting, Mr. Jindal belittled Ms. Molosky and her achievements, ascribing her success with the ProdStrat initiative to "beginner's luck."

71.     Mr. Jindal further devoted a substantial portion of the April 20, 2023 meeting to an insulting comparison of Ms. Molosky to a junior female employee, Fanita Rodrigues (PMT – Level 5), who was exceptionally loyal to Mr. Jindal but lacked Ms. Molosky's technical proficiency, accomplishments, and experience. Mr. Jindal made it clear that he prefers the women who work for him to know their place and show him deference.

72.     On May 10, 2023, Ms. Molosky discussed her career objectives with Mr. Jindal and Mr. Hellmis. Displaying their disdain for women in leadership roles, both men responded dismissively when Ms. Molosky raised her desire to be promoted, discouraging her ambitions. Both men also falsely smeared Ms. Molosky's technical acumen.

73.     During the May 10, 2023 meeting, Mr. Hellmis also had the audacity to express his view that Ms. Molosky should stick to UX (User Experience) and UI (User Interface) *design* work, which are stereotypically feminine duties, and, importantly, *not* a part of the Level 6 or Level 7 PMT roles as defined by Amazon, and further directed that Ms. Molosky should steer clear of complex technical projects and higher-level strategic work, which *are* in fact part of the Level 6 and Level 7 PMT roles, as defined by Amazon. Mr. Hellmis evidently considered more technical initiatives to be beyond the comprehension of a woman, notwithstanding Ms. Molosky's credentials and accomplishments.

74.     Mr. Hellmis further insisted that Ms. Molosky would "enjoy" not being on the "higher level" and avoiding the "burden" of seniority.

75.     In addition to their degrading and sexist comments regarding Ms. Molosky during the May 10, 2023 meeting, both men proceeded to insult and berate another Senior female PMT, Somya Rathi (Level 7), as incompetent, lacking in technical knowledge, and unsuited for senior-level leadership.

76.     Mr. Jindal regularly made gendered comments during one-on-one meetings, insulting Ms. Molosky's performance and the performance of female colleagues. Notably, Mr. Jindal never attacked male team members in this fashion.

77.     Soon after his appointment as Ms. Molosky's supervisor, Mr. Jindal decided to strip Ms. Molosky of her major responsibilities, reassigning them to underqualified and inexperienced male PMTs. As discussed below, Mr. Jindal's reassignment of tasks reflects discriminatory animus.

78.     On May 25, 2023, Mr. Jindal reassigned certain aspects of the ProdStrat Initiative away from Ms. Molosky to Maciek Bil ("Bil"), an underqualified Level 6 male PMT with far less relevant experience and technical expertise compared to Ms. Molosky. In doing so, Mr. Jindal falsely claimed that Ms. Molosky had requested to be relieved of duties.

79.     Mr. Jindal further ridiculed Ms. Molosky for purportedly lacking technical skills by stereotyping her as a UI (User Interface) Designer—a role akin to a Graphic Designer, a predominantly female occupation in the United States—as opposed to a seasoned executive with a track record of success managing technical "back-end" projects. Mr. Jindal told Ms. Molosky that he would "align that the front-end work may be better suited with you [Ms. Molosky], and then the back-end work is better suited with him [Mr. Bil]." Ms. Molosky expressed opposition to these reassignments, repeatedly reminding Mr. Jindal of her qualifications and track record of success in managing both the back-end *and* front-end of highly technical and impactful initiatives. Mr. Jindal nevertheless continued to pigeonhole Ms. Molosky as a UI Designer and became irritated when she questioned his chauvinistic approach.

80.     In the later part of the summer of 2023, Mr. Jindal *fully* reassigned the Unbilled Usage Initiative to Mr. Bil, who had less tenure than Ms. Molosky and who was unqualified to run

the Unbilled Usage Initiative. Unlike Ms. Molosky, Mr. Bil had no financial certifications or knowledge and had never run a technically complex pricing project.

81.     With Mr. Jindal's approval, Mr. Bil began to assign Ms. Molosky his own menial tasks, treating Ms. Molosky like a direct report instead of an equal. Mr. Bil tasked Ms. Molosky with completing his work, including filling out documentation, writing customer emails, running tests, and other assignments beneath her level. Mr. Bil did not pass off his menial work to male team members, just Ms. Molosky.

82.     Ms. Molosky made multiple complaints to Mr. Jindal, verbally in videoconferences and via email on August 29, 2023, expressing opposition to Mr. Bil's chauvinistic conduct and urging Mr. Jindal to address the matter. However, Mr. Jindal actively refused to manage Mr. Bil, who continued to dump menial work on Ms. Molosky, citing Mr. Jindal's apparent approval of this practice.

83.     Remarkably, Mr. Jindal subsequently demanded that Ms. Molosky assist Mr. Bil by ghostwriting technical documents for him because Mr. Bil was "struggling" with the work Mr. Jindal had recently reassigned to Mr. Bil from Ms. Molosky. Mr. Jindal's demand that Ms. Molosky do the work while giving Mr. Bil the credit reflects that Mr. Jindal's discriminatory views against women drove his initial decision to reassign Ms. Molosky's initiatives to Mr. Bil. Mr. Jindal was well aware that Ms. Molosky was better equipped to perform the work at hand but nonetheless removed it from her portfolio so that she would be denied recognition.

84.     During a meeting on July 18, 2023 regarding ProdStrat, Mr. Jindal told Ms. Molosky that "there are a lot of cooks in the kitchen" and demanded that Ms. Molosky "project [herself] as the **leading lady**." Mr. Jindal further said he wanted to take Ms. Molosky's plan to AWS leadership and present it as if it was his own because he was better suited to do so, stating "I

want to get to the position where I [Jindal] project us [our team to AWS Leadership] through these [strategy] talks as someone who can actually take this on [ProdStrat] full-fledged going forward." As a man, Mr. Jindal believed himself entitled to visibility and credit from AWS leadership for Ms. Molosky's initiatives. These remarks were overtly misogynistic and reflect negative stereotypes of women as submissive, retiring, and unsuited for the business world. Mr. Jindal reemphasized these sexist sentiments the next day, telling Ms. Molosky "**You need to be more proactive…**" and "**you need to be more vocal.**"

85.    In addition to the aforementioned discriminatory conduct, Mr. Jindal refused to allow Ms. Molosky to attend strategic meetings with AWS leadership in Berlin. This was despite the fact that Ms. Molosky spent 42 days or six full weeks of 2022 at similar meetings over the course of four trips to Berlin. Mr. Jindal's discriminatory exclusion of Ms. Molosky from pivotal meetings in Berlin *further* stunted her advancement at the Company. In the fall of 2023, Mr. Jindal excluded Ms. Molosky from attending weeks-long team meetings in Berlin. However, Mr. Jindal sent Mr. Bil and Mr. Prakhar Vaish (another PMT)—both male employees at the same level as Ms. Molosky—to Berlin with all expenses paid by Amazon. Yet, Mr. Jindal refused to extend an invitation to Ms. Molosky. Further, Mr. Hellmis invited David Cooper, another male PMT, to the very same fall 2023 Berlin trip without inviting Ms. Molosky, though Mr. Hellmis previously had invited Ms. Molosky to Berlin throughout 2022. Ms. Molosky protested her exclusion from the meetings to Mr. Hellmis and Mr. Jindal and expressed that she felt that she should be in attendance at the meetings for the benefit of AWS.

86.    During a meeting on August 8, 2023, Ms. Molosky complained to Mr. Jindal of Mr. Bil's failure to perform assigned work on the aspect of ProdStrat that Mr. Jindal had reassigned to Mr. Bil. Mr. Jindal responded in a sexist and patronizing fashion, telling Ms. Molosky to "**lean**

**back**" (echoing Mr. Hellmis), and attempting to change the subject and attack Ms. Molosky regarding wholly unrelated issues.

87.    Mr. Jindal blamed the ProdStrat issue caused by Mr. Bil's incompetence on a female AWS Senior Program Manager, Suguna Nekkanti (Level 6). In a sexist diatribe without any basis, Mr. Jindal accused Ms. Nekkanti of not being "strong", and incapable of "push[ing] back" and "shepherding the troops."

88.    Showing his sexism yet again, Mr. Jindal proceeded to suggest that, as a female manager, Ms. Molosky (like Ms. Nekkanti) was weak and unfit to lead. Ms. Molosky indicated to Mr. Jindal that she opposed his chauvinistic behavior.

89.    Mr. Jindal reassigned the parts of Ms. Molosky's ProdStrat initiative—that she at that time still led—to yet another male PMT, Mr. Naitik Jha, on or about August 11, 2023. Mr. Jha, a man who did not have experience nor expertise commensurate with Ms. Molosky's, was unqualified to see ProdStrat to its fruition. At this time, Ms. Molosky was deeply entrenched in the implementation of ProdStrat—approximately eight months after she succeeded in convincing top AWS executives of the merits and benefits of ProdStrat, shortly thereafter earning the proverbial executive "green light" and securing the formal financing thereof.  Nevertheless, Mr. Jindal instructed Ms. Molosky to train Mr. Jha and teach him how to complete the implementation of, and eventually run, ProdStrat as her replacement. The fact that Mr. Jindal required Ms. Molosky to train her replacement reflects that his decision to exclude her from what was originally *her* high-profile project was based on animus, and not on any legitimate business reason.

90.    Mr. Jindal also instructed Mr. Jha to rewrite Ms. Molosky's ProdStrat plan documents under a new name, the "Service Commercialization Initiative", to present to AWS leadership. Thereafter, Mr. Jha presented his rewrites to AWS leadership, attempting to take credit

for ProdStrat overall and therefore depriving Ms. Molosky of the recognition due to her in connection with ProdStrat.

## VIII.  AWS TERMINATED MS. MOLOSKY DUE TO DISCRIMINATION AND IN RETALIATION FOR A PROTECTED DISCRIMINATION COMPLAINT

91.     On August 8, 2023, immediately after telling Ms. Molosky to "**lean back**" and questioning whether she was "strong" enough to meet her leadership responsibilities, Mr. Jindal attempted to initiate a Pivot Plan (Amazon's formal performance improvement plan) for Ms. Molosky. Mr. Jindal did not inform Ms. Molosky of this Pivot Plan until he received permission from Andrea Devers, who was, in fact, Ms. Molosky's "HR Business Partner", despite the fact that Ms. Devers claimed in May 2022 that she was not Ms. Molosky's HR Business Partner when Ms. Molosky made her pay inequity complaint to Ms. Devers.

92.     On September 8, 2023, Ms. Molosky made a protected complaint to Mr. Hellmis regarding Mr. Jindal, citing, *inter alia*, Jindal's unprofessional and chauvinistic behavior towards her, the hostile work environment he generated, and the resulting emotional and mental health impact stating that she "lack[ed] psychological safety during [her] 1:1" meetings with Jindal. Ms. Molosky implored Mr. Hellmis to take action and consider the wisdom of *not* conferring Mr. Jindal *any* additional authority in view of his abuses. Mr. Hellmis responded cursorily and failed to take any action to address Ms. Molosky's concerns.

93.     On September 12, 2023, just 4 days after Ms. Molosky's protected complaint, AWS informed Ms. Molosky of the forthcoming implementation of Mr. Jindal's Pivot Plan.

94.     The Pivot Plan is proof that so-called "performance issues" are a pretext, and not a valid justification for Ms. Molosky's termination.

95.     The Pivot Plan purported to identify shortcomings in Ms. Molosky's performance, i.e., "**You failed to Earn Trust…**". The subjective and amorphous reasons proffered for implementing the Pivot Plan confirm that it was a sham attempt by AWS to fabricate a non-discriminatory, non-retaliatory justification for terminating Ms. Molosky.

96.     The Pivot Plan also became a vehicle for Mr. Jindal to escalate his discrimination and retaliatory harassment of Ms. Molosky. Both the substantive and procedural aspects of the Pivot Plan were clearly designed to guarantee that Ms. Molosky would fail.

97.     Although the Pivot Plan was presented as a contract with fixed and predefined goals that Ms. Molosky and AWS agreed to in writing, AWS failed to abide by and altered the Pivot Plan requirements to ensure that Ms. Molosky would not succeed.

98.     Pursuant to the Pivot Plan, Ms. Molosky was required to satisfy a total of 22 mandatory individual "measurements", each of which was labor-intensive, in just over one month between the specified dates of September 18, 2023 and October 20, 2023.

99.     In meetings with Mr. Jindal on September 19, 25, 28, and October 3, 10, and 17, 2023, Mr. Jindal confirmed that Ms. Molosky was on track to satisfy all terms of the Pivot Plan.

100.    Ms. Molosky completed the Pivot Plan requirements successfully.

101.    However, on or about October 24, 2023, after the Pivot Plan evaluation period ended, Mr. Jindal communicated to Ms. Molosky that she had failed to meet any of the terms of the Pivot Plan. In direct opposition to the terms therein, Mr. Jindal had unilaterally and without notice revised the required criteria for Ms. Molosky to successfully fulfill the Pivot Plan.

102.    Importantly, Mr. Jindal never recorded his revisions to the Pivot Plan requirements in writing or gave Ms. Molosky a new document setting forth the revised standards, in violation of Amazon Policy. He informed Ms. Molosky that she had failed his new version (known only to

him and unrecorded), giving Ms. Molosky no notice and no chance to even try to fulfill the new

measurements as the evaluation period was already over.

103.    Examples of Mr. Jindal's bad faith, *ex post facto* changes to the Pivot Plan

requirements to ensure Ms. Molosky's failure include (but are not limited to) the following:

a.  The Pivot contract expressly limited the temporal scope of work to be considered in assessing Ms. Molosky's fulfillment of Pivot Plan objectives to assignments she completed between September 18, 2023 and October 20, 2023. However, Mr. Jindal relied upon work Ms. Molosky completed before September 18, 2023, concluding that Ms. Molosky did not satisfy the Pivot Plan. For example, Mr. Jindal wrote, "You [Ms. Molosky] did not incorporate feedback from the first draft [of a required document] reviewed in March 2023".

b.  Mr. Jindal's negative evaluation pointed to Ms. Molosky's alleged failure to adhere to undocumented procedures and formalities—unknown to both Senior AWS Leaders and Ms. Molosky alike—even though these were not requirements of the Pivot contract. Mr. Jindal expanded and contorted the rules. For example, Mr. Jindal claimed in his evaluation that Ms. Molosky "limit[ed] their [PPOA Leader (L8), Mr. Hellmis and Billing Leader (L10), Mr. Shaviner] ability to provide sign off" on the required feature proposal. Nothing in the Pivot contract required Ms. Molosky to obtain PPOA Leader (L8)'s sign-off. Further, "sign-off" was neither an established nor documented process within the AWS Billing organization where Ms. Molosky worked. In fact, when another Pivot requirement asked for Ms. Molosky to obtain "sign-off on the BRD [business requirements document]" from the "WWPS [Worldwide Public Sector] Lead (L7)"—Jesse Skorupa, Senior Manager of WWPS Pricing Compliance (L7) with 15 years of tenure at Amazon— confirmed that Ms. Molosky had successfully obtained his sign-off approval, and stated that he was unaware of any formal "specific approval" requirement beyond that which he gave to Ms. Molosky.

c.  Mr. Jindal once again expanded the scope of Ms. Molosky's Pivot Plan after Ms. Molosky's completion deadline on October 20, 2023. The Pivot Plan included a requirement to deliver an internal "launch announcement email on the [Unbilled Usage] feature" without specifying to whom the launch announcement was required to be delivered. Per usual AWS practice, Ms. Molosky emailed the launch announcement to AWS service teams to whom the launch announcement was potentially pertinent on October 10, 2023. In total, Ms. Molosky sent the announcement to over 110 AWS service product teams and all L10+ AWS Billing Leaders. Later that day, Mr. Jindal personally replied to the entire audience of the same launch announcement email Ms. Molosky sent, writing, "Great to see teams collaborating to build features that help service teams identify and resolve unbilled usage. Congratulations, all!" Notwithstanding the lack of specific guidance, Ms.

Molosky's compliance with past practice, and Mr. Jindal's written public affirmation of Ms. Molosky's launch announcement, Mr. Jindal, in yet another act of discrimination against Ms. Molosky, faulted her for "fail[ing] to send launch announcement to all [over 220 global] Service product teams."

d. Finally, and most telling of his deep prejudice against Ms. Molosky and women in the workplace, Mr. Jindal bizarrely claimed that Ms. Molosky fell short of the Pivot Plan measurement to "schedule and complete PR-FAQ [Unbilled Usage business plan document] review with Billing Leader (L10) [Gleb Shaviner]". Ms. Molosky completed the review with Mr. Shaviner on October 11, 2023. Mr. Jindal was present at the review, nonetheless asserting that Ms. Molosky failed to complete the task, writing, "While you [Ms. Molosky] provided a response to all comments in the document, you failed to take point as primary respondent during Q&A, with Nicolas [Mr. Nicolas Romanetti, Senior Software Development Engineer (L6)] and Manish [Mr. Manish Verma, Senior Software Development Manager (L6)] taking majority of the questions from the leaders". Mr. Jindal's statement is highly sexist and builds on his past statements of senior women leaders being too "weak", implying that Ms. Molosky needed her two male colleagues to take over and answer the questions about the technical subject matter. In contrast to Mr. Jindal's sexist and false assertion, Mr. Romanetti and Mr. Verma separately agreed in writing that Ms. Molosky led the review with Mr. Shaviner and that she had answered the majority of Mr. Shaviner's questions. Furthermore, per the timestamped meeting transcript, Ms. Molosky spoke 57.96% of the time during the review, 3.14 times more than Mr. Verma and 2.16 times more than Mr. Romanetti. Mr. Jindal's determination that, despite spearheading the Unbilled Usage Initiative, Ms. Molosky somehow fell short of Pivot Plan requirements in this area reflects that the Pivot Plan was not only a sham but a means for Mr. Jindal to continue his chauvinistic and degrading treatment of Ms. Molosky.

104. Mr. Jindal deemed Ms. Molosky not to have satisfied the requirements of her Pivot Plan despite Ms. Molosky's submission of voluminous written evidence to the contrary. Among other evidence, Ms. Molosky submitted the written accounts of over ten AWS employees who were, per the Pivot Plan, to provide solicited "periodic feedback" to Mr. Jindal to assist him in assessing her successful completion of the measurements. However, these supporting accounts were ignored.

105.    AWS claimed that Ms. Molosky fell short of satisfying the Pivot Plan, choosing to disregard the extreme substantive and procedural unfairness of the process, and Mr. Jindal's subversions of the rules to ensure that Ms. Molosky would fail.

106.    Mr. Jindal's design and manipulation of the Pivot Plan to ensure Ms. Molosky would fail and be terminated is further proof of discrimination and retaliation.

107.    Ms. Molosky appealed the adverse decision, but AWS rejected her appeal out of hand and rubber-stamped Mr. Jindal's conclusions.

108.    In assessing Ms. Molosky's performance, AWS refused to credit Ms. Molosky's official AWS Credentials or her outstanding track record of revenue generation for AWS.

109.    Pursuant to the rigged and bias-tainted process set up by Mr. Jindal and sanctioned by AWS, Ms. Molosky's employment was unlawfully terminated on December 4, 2023. Ms. Molosky received definite and official notification of her termination on such date.

110.    As a direct and proximate result of AWS's unlawful actions, Ms. Molosky has suffered greatly, including, but not limited to, monetary damages, reputational and professional damages, and extreme mental and physical anguish and distress that has disrupted her personal life and resulted in the loss of enjoyment of the pleasure of everyday life.

## IX.    STATEMENT OF CLAIMS

## COUNT I – GENDER DISCRIMINATION AND HOSTILE WORK ENVIRONMENT

111.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

112.    Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-2(a) [Section 703] provides that it shall be an unlawful employment practice for an employer: "(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any

individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; . . ."

113.    Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e et seq., by subjecting Plaintiff to discrimination, sexual harassment, and a hostile work environment on the basis of her sex/gender.

114.    Defendants have discriminated against Plaintiff by discriminating against her relative to similarly-situated male employees and by subjecting her to a severe and pervasive hostile work environment, discriminatory pay, disparate terms and conditions of employment, and other forms of discrimination on the basis of her gender in violation of the law.

115.    As a direct and proximate result of Defendants' unlawful employment practices, Plaintiff has suffered physical manifestations of stress, extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damages to her good reputation, disruption of her personal life, familial discord, and the loss of enjoyment of the ordinary pleasures of everyday life.

116.    Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

117.    By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of Title VII, including declaratory, injunctive and equitable relief, and monetary damages, including economic damages, compensatory damages, punitive damages, and attorneys' fees and costs.

## COUNT II – RETALIATION PURSUANT TO TITLE VII

118.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

119.    Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-3(a) provides that it shall be unlawful employment practice for an employer: "(1) to . . . discriminate against any of his employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

120.    The exact number of employees at Defendants is unknown, but upon information and belief, well more than the statutory minimum.

121.    Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e et seq., by retaliating against Plaintiff with respect to the terms, conditions or privileges of employment because of her opposition to the unlawful employment practices of Defendants.

122.    By reason of Defendants' retaliation, Plaintiff is entitled to all remedies available for violations of Title VII, including declaratory, injunctive and equitable relief, and monetary damages, including economic damages, compensatory damages, punitive damages, and attorneys' fees and costs.

## COUNT III – GENDER DISCRIMINATION AND HOSTILE WORK ENVIRONMENT PURSUANT TO THE NYSHRL AND NYCHRL

123.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

124.    Defendants have discriminated against Plaintiff in violation of the New York State Human Rights Law by subjecting her to different treatment on the basis of her gender. Plaintiff

has suffered disparate treatment on the basis of her gender as a result of Defendants' wrongful conduct.

125.    Defendants have further discriminated against Plaintiff in violation of the New York City Human Rights Law by subjecting her to different treatment on the basis of her gender. Plaintiff has suffered disparate treatment on the basis of her gender as a result of Defendants' wrongful conduct.

126.    Defendants have discriminated against Plaintiff by treating her differently from and less preferably than similarly-situated male employees and by subjecting her to a severe and pervasive hostile work environment, discriminatory pay, disparate terms and conditions of employment, and other forms of discrimination on the basis of her gender in violation of the law.

127.    As a direct and proximate result of Defendants' unlawful employment practices, Plaintiff has suffered physical manifestations of stress, extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damages to her good reputation, disruption of her personal life, familial discord, and the loss of enjoyment of the ordinary pleasures of everyday life.

128.    The discrimination, hostile work environment, and retaliation that Plaintiff suffered while employed by Defendants severely affected the terms and conditions of her employment.

129.    Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

130.    By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law and the New York City Human Rights Law as to all Defendants. Plaintiff shall seek attorney's fees and punitive damages.

## <u>COUNT IV – RETALIATION PURSUANT TO THE NYSHRL, NYCHRL, AND NYLL</u>

131.    Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

132.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

133.    Plaintiff repeatedly complained to Defendants and/or Defendants' policymakers about the severe and pervasive gender discrimination, sexual harassment, hostile work environment, and retaliation she was subjected to during her employment with Defendants.

134.    Plaintiff notified Defendants of the severe gender discrimination, sexual harassment, hostile work environment, and retaliation she was subjected to and repeatedly protested the harassment and discrimination.

135.    Plaintiff's complaints were repeatedly ignored and discouraged by Defendants in accordance with Defendants' policy, practice, and/or custom of discrimination and retaliation.

136.    Defendants, unlawfully and without cause, retaliated against Plaintiff as a direct result of Plaintiff complaining about the incidents of gender discrimination, hostile work environment, and retaliation.

137.    Because she protested Defendants' unlawful behavior, Plaintiff was subjected to retaliation throughout the course of her employment and after termination.

138.    The retaliation substantially interfered with Plaintiff's employment and created an intimidating, offensive, and hostile work environment.

139.    Defendants knew or should have known about the retaliation and the effect it had on Plaintiff's employment but failed to take any action to stop the retaliatory conduct.

140.    As a direct and proximate result of said unlawful employment practices and disregard for Plaintiff's rights and sensibilities, Plaintiff has lost and will continue to lose substantial income including, but not limited to wages, social security, and other benefits due to her.

141.    Additionally, Plaintiff has suffered the indignity of discrimination and retaliation, the invasion of her rights to be free from discrimination, and great humiliation, which has manifested in serious emotional stress and physical illness.

142.    As a further direct and proximate result of Defendants' unlawful employment practices, Plaintiff has suffered physical manifestations of stress, extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damages to her good reputation, disruption of her personal life, familial discord, and the loss of enjoyment of the ordinary pleasures of everyday life.

143.    Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff.

144.    By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law, the New York City Human Rights Law, and NYLL (Equal Pay Act retaliation provisions). Plaintiff shall seek attorney's fees and punitive damages.

## COUNT V – VIOLATION OF THE EQUAL PAY ACT

145.    Plaintiff realleges and incorporates all the foregoing paragraphs of this Complaint as if fully set forth herein.

146.    At all relevant times, Defendants were and continue to be employers engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a). Further, Plaintiff is a covered individual within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a).

147.    At all relevant times, Defendants employed Plaintiff within the meaning of the EPA.

148.    At all relevant times, each of the Corporate Defendants had gross annual revenues in excess of $500,000.

149.    At all relevant times, Defendants violated the EPA because of their policy and practice of disparately paying Plaintiff less than similarly-situated male comparators.

150.    Under the Equal Pay Act, employers are prohibited from "paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). Defendants violated Plaintiff's statutorily protected rights under the Equal Pay Act by paying higher wages to employees of the opposite sex for the performance of equal work, on jobs requiring equal skill, effort, and responsibility, and for jobs which were performed under similar working conditions.

151.    Records, if any, concerning the number of hours worked by Plaintiff and the actual compensation paid to Plaintiff should be in the possession and custody of Defendants. Plaintiff intends to obtain these records by appropriate discovery proceedings to be taken promptly in this case and, if necessary, will then seek leave of Court to amend this Complaint to set forth the precise amount due.

152.    Defendants knew of and/or showed a willful disregard for the provisions of the EPA.

153.    As a direct and proximate result of Defendants' willful disregard of the EPA, Plaintiff are entitled to liquidated (i.e., double) damages pursuant to the EPA.

154.    Due to the intentional, willful and unlawful acts of Defendants, Plaintiff suffered damages in an amount not presently ascertainable Plaintiff is entitled to an award of their reasonable attorneys' fees and costs.

## COUNT VI – VIOLATION OF THE NY EQUAL PAY ACT AGAINST ALL DEFENDANTS

155.    Plaintiff realleges and incorporates all the foregoing paragraphs of this Complaint as if fully set forth herein.

156.    At all relevant times, Plaintiff was employed by Defendants within the meaning of the NYLL §§ 2 and 651.

157.    Under the NY EPA, "[n]o employee with status within one or more protected class or classes shall be paid a wage at a rate less than the rate at which an employee without status within the same protected class or classes in the same establishment is paid for: (a) equal work on a job the performance of which requires equal skill, effort and responsibility, and which is performed under similar working conditions, or (b) substantially similar work, when viewed as composite of skill, effort, and responsibility, and performed under similar working conditions.". NYLL § 194. Defendants violated Plaintiff's statutorily protected rights under the NY EPA by paying higher wages to employees of the opposite sex for the performance of equal work, on jobs requiring equal skill, effort, and responsibility, and for jobs which were performed under similar working conditions.

158.    At all relevant times, Defendants violated the NY EPA because of their policy and practice of disparately paying Plaintiff less than similarly-situated male comparators.

159.    Defendants' conduct was intentional, malicious, willful or in reckless disregard of Plaintiff's protected rights under the NY EPA.

160.    At all relevant times, Defendants violated the NYEPA because of their policy and practice of disparately paying Plaintiff less than similarly-situated male comparators.

161.    Due to Defendants' NY EPA violations, Plaintiff is entitled to recover from Defendants damages pursuant to the NY EPA.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

a.  A declaratory judgment that the practices complained of herein are unlawful under Title VII, NYSHRL, NYCHRL, the EPA, and the NY EPA.

b.  An injunction against Defendants and its officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

c.  Back wages, front wages, compensatory damages, and emotional distress damages under Title VII.

d.  Liquidated damages under Title VII.

e.  Back wages, front wages, compensatory damages, emotional distress damages, and punitive damages under NYSHRL and NYCHRL in an amount of at least $5 Million.

f.   Liquidated damages under the NYSHRL and NYCHRL.

g.   Back pay and liquidated damages under the EPA.

h.   Back pay, liquidated damages and treble damages under the NY EPA.

i.   Damages for physical injuries suffered as a result of Defendants' unlawful conduct.

j.   An award of pre-judgment and post-judgment interests, costs and expenses of this action together with reasonable attorneys' and expert fees and statutory penalties; and

k.   Such other relief as this Court deems just and proper.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable as of right by jury.

Dated:      Huntington, NY
            February 2, 2025

                        Respectfully Submitted,
                        **TA LEGAL GROUP PLLC**

            By:      _____
                        Taimur Alamgir, Esq.
                        315 Main Street, Second Floor
                        Huntington, NY 11743
                        Tel. (914) 552-2669
                        tim@talegalgroup.com
                        *Co-Counsel For Plaintiff Anna E. Molosky*

                        **BROWN KWON & LAM LLP**
                        William M. Brown, Esq.
                        521 Fifth Avenue, 17th Floor
                        New York, NY 10175
                        (718) 971-0326
                        wbrown@bkllawyers.com
                        *Co-Counsel For Plaintiff Anna E. Molosky*